## POWERS *vs.* SHEPARD.

An agreement by the supervisor of a town to pay a stipulated sum to another, in consideration that the latter will recruit and furnish for the former, and for his town, a certain number of three years naval recruits, or the credit of the same duly made, which sum exceeds the rate of $600 for each man, contravenes the provisions of section four of chapter 29 of the laws of 1865, forbidding the payment of bounties above the amount therein prescribed, and is therefore void.

The fact that such a contract is not made with a volunteer, nor for the payment of bounties, will not authorize a recovery thereon. The policy of the law is destroyed by permitting contracts for procuring volunteers by the payment, to any one, of an amount beyond the sums prescribed by the act for bounty and hand-money.

The act of February 10, 1865, (*Laws of* 1865, *ch.* 29,) was not repealed by the act of February 24, 1865, (*Laws of* 1865, *ch.* 41;) it being the intention of the

legislature that the former act should be considered in full force, notwithstanding the enactment of the latter.

The provisions of chapter 29, of the Laws of 1865, prescribing a maximum sum to be paid for enlisting soldiers, and forbidding the payment of a higher sum by cities, counties, &c. are not unconstitutional.

The 4th section of that act took effect immediately, notwithstanding the provisions of chapter 41 of the laws of 1865, suspending the operation of the sections of chapter 29, incorporated into chapter 41, and there re-enacted.

MOTION by the plaintiff for judgment on a verdict rendered in his favor, subject to the opinion of the court at general term.

The case proved is briefly this: In March, 1865, the defendant was the supervisor of the town of Sparta, in the county of Livingston, and as such was engaged in raising recruits to fill the quota of that town under the call for men for the army and navy of the United States, issued by the president on the 19th December, 1864, or the next call thereafter. For that purpose he entered into an agreement in writing with the plaintiff, dated at Jersey City, the 9th March, 1865, by which he, as such supervisor, authorized the plaintiff to recruit and furnish for the defendant and for his said town, 17 three years naval recruits, or the credit of the same duly made, for each of which he agreed to pay the sum of eight hundred dollars. On the 21st March, 1865, he made a second agreement, indorsed upon the first, by which he undertook to pay to the plaintiff for furnishing the recruits provided for in the first agreement, the additional sum of eight hundred and fifty dollars besides the amount mentioned in said first agreement. The plaintiff furnished the number of men provided for, between the 21st and the 25th March, and the defendant paid the sum stipulated in the first agreement. This suit was brought to recover the additional sum of $850, under the second agreement. On the trial the defendant moved to dismiss the complaint, on the ground that the contract sued on is void, and is in violation of the laws of this state, and particularly of chapter 29 of the Laws of 1865, and of the fourth section

of that act. The motion was denied, and the defendant's counsel excepted.

The court directed a verdict for the plaintiff, subject to the opinion of the court at general term.

*Ira D. Warren,* for the plaintiff. I. The legislature passed an act on the 10th day of February, 1865, which is chapter 29 of the laws of 1865. On the 24th day of February, 1865, they passed another act, or repassed the act of February 10, 1865, except §§ 11, 12, 13, 14 ; these sections were altered and changed in various respects by the last act. (*Chap.* 41, *Laws of* 1865.) The evident intention of the legislature in repassing this act of Febraury 10, was to make it conform to the requirements of the constitution, and have the act submitted to the people before any part of it should become a law. The act of February 10, 1865, § 4, declares that §§ 1, 2, 3, 4, 5, 6, 7, 11, 12, 13, 14, shall take effect immediately ; while § 11 provides that *this* act, which includes all these sections, shall be submitted to the people. The sections which the legislature here declare shall take. effect immediately all depend upon §§ 8, 9, 10 ; if those were rejected by the people, the other sections could not be carried out. This act of February 10, 1865, was therefore clearly in violation of article 7, § 12, of the constitution. In the act of February 24, they provide that this act, which includes §§ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, of the act of February 10, "*shall not* take effect until after the next general election," which would be in November, 1865, &c. We have therefore the act of February 10, declaring that certain sections shall take effect immediately, and the act of February 24, declaring that none of them shall take effect until the people have voted upon them at the next general election. The first act, so far as it conflicts with the last act, or is inconsistent with it is repealed by the last. "*Leges posteriores priores contrarias abrogant.*" (*D. & L. Plank Road Co.* v. *Allen,* 16 *Barb.* 15. *Dash* v. *Van Kleeck,* 7

*John.* 477, 497. *Colum. Man. Co.* v. *Vanderpoel,* 4 *Cowen,* 556. *Livingston* v. *Harris,* 11 *Wend.* 329. *Harrington* v. *Trustees of Rochester,* 10 *id.* 547.) It is the settled rule in England that where two acts passed at the same session of parliament are repugnant or contradictory to each other, the last will prevail and will have the effect of repealing the previous statute. (*Rex* v. *The Justices of Middlesex,* 2 *B. & Ad.* 818. *Paget* v. *Foley,* 2 *Bing. N. C.* 679.) This rule is the same in various states of the Union. (*Illinois and Michigan Canal* v. *Chicago,* 14 *Ill. Rep.* 334. *Johnson* v. *Boyd,* 1 *Hemp.* 434. *Quick* v. *White Water Township,* 7 *Ind. Rep.* 570. *Parker* v. *Sunbury and Erie R. R. Co.,* 19 *Penn. Rep.* 211. *United States* v. *Irwin,* 5 *McLean,* 178.) Therefore we say that the act of February 24, 1865, is the act under which the plaintiff's rights are to be determined. The defendant claims that the contract in suit is void under the fourth section of the act of February 10, 1865, (which is alike in both acts,) while we claim that § 11 of the act of February 24, 1865, declaring that it should not take effect until afer the following November election, repealed the fourteenth section of the act of February 10, 1865, and therefore at the time this contract was made there was no law prohibiting a man from buying as many volunteers as he desired, at any price he chose to pay, unless the legislature can make parties amenable to a law before the time they declare such law shall take effect.

The constitution of 1846, (*art.* 7, § 12,) provides that "No such law shall take effect until it shall at a general election have been submitted to the people, and have received a majority of all the votes cast for and against it at such election." (1 *R. S. 5th ed.* 67, § 12.) Had they declared that this act should take effect immediately on its passage, it would have been clearly in violation of the constitution ; therefore the declaration of the legislature at the beginning of § 11 that "*it should be a law from the time of its passage,*" is in violation of the constitution, unless the legisla-

ture meant that it should become a law from the time of its adoption by the people, which was undoubtedly their intention. Where an act of the legislature depends upon any future contingency, it cannot take effect or become a law until that contingency has happened. (*Savage* v. *Walshe*, 26 *Ala. Rep.* 619. 1 *Kent, 9th ed.* 513.) Therefore we say that the fourth section of this act under which the defendant claims this contract was void, had not taken effect and was not the law at the time this contract was made.

II. Section four in these acts provides that "No city, county or town, shall hereafter borrow or raise by tax any money for the purpose of paying bounties to volunteers, drafted men, or substitutes under the said call, dated 19th of December, 1864, or any future call, otherwise than is provided in section seven hereof, and not to exceed $100 for hand money, and for incidental expenses for procuring each volunteer. Nor shall any city, county or town, or any individual or individuals pay any money for such purpose or purposes otherwise than as is herein provided" (except that an individual may in any way hire a substitute to exempt himself from draft, &c.)

The defendant now claims that by virtue of this act, and particularly of this section, an individual had no right to agree to pay more than $600 for a three years volunteer, and if he did the contract was void. (*a.*) The language of the statute is that it shall not be paid "*otherwise than is herein provided;*" it does not say no greater *amount* shall be paid. (*b.*) It then provides that every "act, proceeding, or resolution of any board of supervisors, or of the common council of any city, or of any board of town officers, or of any officer of any county, city or town, in contravention of the provisions of this act shall be void. It does not declare that it shall be void if an *individual* violates it, nor attach any consequence to such violation. (*c.*) This act was not in force at the time the contract in question was made, as we have shown under the first point. (*d.*) If it was in force, then we

say so far as it restricts the price an individual may pay for volunteers for the army, it is unconstitutional. The principle of the English government that the parliament is omnipotent does not prevail here, and an act of the legislature which violates the spirit of either the constitution of the United States or of this state, will be declared unconstitutional by the courts. The legislature when they attempt to prescribe the amount a man shall be at liberty to pay for an article of commerce, or how much he shall purchase, or the wages he shall pay for services rendered him, violate one of the natural rights of every citizen to use his own property as he pleases, provided he interferes with no other persons' rights. The legislature might with the same propriety say that no individual should pay more than one dollar for a coat, and he should buy only one. Or two cents for a dinner, and he should have but one during a week's time, or that he should pay his servant but a penny a day for his services. When this can be done we have indeed returned to the days of sumptuary laws, and the natural rights of the citizen are violated and destroyed by arbitrary and unrestrained legislation. This subject has been fully and ably discussed by Justice CLERKE, on a demurrer in the case. (1 *Abb. Pr. N. S.* 129.)

III. The third section of this act provides "There shall be paid to *each volunteer,* aforesaid, a sum not exceeding $600, if he enlist for three years, &c." The defendant now claims that the agreement he made to pay the plaintiff more than $600 for furnishing him the recruits is void. The act provides that no more than $600 shall be paid "*to each volunteer.*" It does not appear that more than $600 was paid to any of these volunteers. At common law, before these acts were passed, an individual could pay what he pleased to a volunteer, and hire as many as he pleased, and the transaction was lawful. This act, therefore, is in derogation of the common law, and should be strictly construed. (*Smith* v. *Moffat,* 1 *Barb.* 65. *Sprague* v. *Birdsall,* 2 *Cowen,* 419.

*Bridgewater and U. Plank Road Co.* v. *Robbins,* 22 *Barb.* 662. *Rathbun* v. *Acker,* 18 *id.* 393. 4 *Mass. R.* 145, 473.) The only prohibition in the act is as to the amount to be paid *the volunteer,* and unless it appears that the action is brought to recover a greater amount than $600 each, which has been paid to volunteers or substitutes, the contract is valid. (*Powers* v. *Shepard,* 1 *Abb. N. S.* 129.)

*S. T. Freeman,* for the defendant. I. The contract upon which this action is brought, is in violation of both letter and spirit of chapter 29, of the Laws of 1865, and by the fourth section thereof expressly declared to be void. 1. It is in violation of the letter of the law. The third section of the act provides that the bounty to be paid to volunteers of the class referred to in the contract, shall not exceed the sum of $600 each. And the fourth section provides that in addition to that amount there may be paid for the procurement of such volunteers, a sum not exceeding $100 for each. And then it is added, "nor shall any city, county or town, or any *individual* or individuals, pay any money for such purpose or purposes otherwise than as is herein provided (except that an individual may in any way hire a substitute to exempt himself from draft.") And then again it is added, "every act, proceeding or resolution of any board of supervisors, or of the common council of any city, or of any board of town officers, or *of any officer of any county, city or town,* in contravention of the provisions of this section shall be void." 2. It is in violation of the spirit of the law. The general object of this act is, as stated in its title, "to provide for filling the quota of men required from this state for the army and navy of the United States," and among the means by which the legislature would accomplish this object are these : *first,* to secure a uniform bounty throughout the state and to prevent volunteers from being bought up at exorbitant prices in one section of the state and credited upon the quota of other and remote sections ; and *secondly,* to avoid

the extortionate interference of that large class of fungous ·
adventurers, who sprang up during the war, and were known
as *substitute brokers*, for in addition to the provisions of the
act which are above referred to, section five provided that
the bounties shall be paid only to the volunteers in person,
&c. and declares void certain agreements between volunteers
and brokers, middlemen or agents. And it would seem also,
especially from the language of the second section, that the
legislature had in view the prevention of fraudulent *credits,
mere* credits without the volunteers, which they purported
to represent. Now the contract upon which this action is
brought is evidently at variance with each of these objects.
It tends to unequalize the bounties and raise the price of
substitutes. It takes men enlisted in or about the city of
New York, and credits them to the quota of a distant county.
It countenances and encourages the extortions of the substi-
tute broker. And it affords the opportunity for these fraud-
ulent *credits;* notice the language of the contract—the men
are to be furnished *or* credits thereof are to be procured.

II. This act of 1865, is neither unconstitutional, nor in con-
flict with any of those natural rights, if there are any such,
which qualify or restrict legislative power. 1. The law is
constitutional. And stating this as a proposition is all that
need be said about it, for neither the plaintiff's counsel nor the
court below point out or suggest any constitutional require-
ment or restriction with which this law in any degree con-
flicts. 2. The power of the legislature, in its proper sphere,
that is, in the exercise of *legislative* power, in contradistinc-
tion to executive and judicial power, is unlimited, except by
constitutional restraints or restrictions. If it were other-
wise, if the courts might limit this power, by what they
would call inherent natural rights, then the power must be
subject to constant variations and modifications, according
to the different views of different judges as to what are such
rights. The difficulties and the dangers to be apprehended
from this doctrine of judicial limitation of legislative power ·

are suggested by Mr. Justice Comstock in the case of *Wyne-hamer* v. *The People*, (3 *Kern.* 391, 392.) And all the later decisions of the courts hold that legislative power can only be limited by the constitution. (*See per A. S. Johnson, J. Wynehamer* v. *The People, supra; Verplanck, senator, Cochran* v. *Van Surlay*, 20 *Wend.* 381; *Selden, J.* 3 *Kern.* 391; *Shankland, J. The People* v. *Draper*, 15 *N. Y. Rep.* 549; *Allen, J. Leggett* v. *Hunter*, 19 *id.* 463; *Emott, J. Bank of Chenango* v. *Brown*, 26 *id.* 469.) . 3. This statute does not so conflict with any natural rights, that it should be viewed with disfavor by the courts, or construed with unwonted strictness. On the contrary it rather commends itself to the court's approbation, merits a liberal construction and demands a rigid enforcement. If in any of its features it would seem to be harsh, the peculiar exigencies under which it was passed afford a sufficient reason and an ample excuse for such as these. In times of war or of any pressing emergency, measures which would not be thought of in times of peace and quiet, become not only justifiable but often indispensable. When a pestilence rages or even threatens itself, we cheerfully submit to sanitary regulations which otherwise might be intolerably annoying. And in case of a famine or siege, I apprehend that with great propriety, men might be limited both as to what and how much they should eat and drink. When this law was passed, men had to be furnished, and furnished promptly, in response to the President's call for reinforcements. Almost every conceivable method had already been tried to fill up the quotas under previous calls. The severities of a draft were already being felt. And bounties for volunteers and the prices of substitutes were running up to such figures as were entirely beyond the reach of men of ordinary means. Now the evident purposes of this law were not only to reinforce the armies of the nation and thus support the government, but in addition thereto to relieve and protect the citizen and render equal assistance to rich and to poor in escaping from the terrors of a conscription. The

Powers *v.* Shepard.

legislature proposes to remove the burden from the shoulders of the comparatively few, upon whom it may chance to fall, and to distribute it equally, so that all may bear a part. 4. This statute does not assume to fix or limit the amount which any particular person shall pay for a substitute, but it expressly excepts any such restriction. (§ 4.) It merely provides that volunteers to be credited to particular counties, cities or towns, and middlemen or brokers procuring such volunteers, shall be paid no more than a certain amount therein specified. And these provisions exactly apply to the contract in suit.

JAMES C. SMITH, J. It is insisted upon by the defendant's counsel that the agreement sued on is in violation of the fourth section of chapter 29 of the laws of 1865. The first three sections of the statute referred to provide for the payment of a state bounty to volunteers furnished from this state as in said act provided, in order to fill the quota of the state under the call of 19th December, 1864, and also under any subsequent call, during the war then existing, such bounty not to exceed the sum of $600 to a volunteer for three years, $400 to one for two years, and $200 to a volunteer for one year. The fourth section provides that no city, county or town shall thereafter borrow or raise money for paying bounties to volunteers under said call, or any subsequent call, otherwise than as is provided in the seventh section of said act, and not to exceed one hundred dollars for hand money and incidental expenses for procuring each volunteer ; "nor shall any city, county or town, or any individual or any individuals, pay any money for such purpose or purposes, otherwise than as is in said act provided, (except that an individual may in any way hire a substitue to exempt himself from draft.") The seventh section amends section 22 of chapter 8. of the laws of 1864, which in its original form authorized the raising of money upon the credit of towns and counties for the purpose of paying local bounties to volunteers. By the

amendment a proviso was added, to the effect that the bounties raised, paid or offered under the provisions of that section, shall not exceed in amount the state bounties provided for by said act of 1865.   One of the objects specified in the title of the last mentioned act is " to prohibit any local bounties to volunteers," drafted men or substitutes.

The intent of the prohibitions and restrictions contained in section four, seems clear.   They were designed to prevent the serious mischiefs resulting from an unrestricted competition between different localities, in respect to bounties, which we may know judicially, as matter of public history, were widely and severely felt by the people of the state before the passage of the act referred to.   Under the stimulus of such competition, extravagant local bounties were offered and paid, on every hand ; an enormous load of debt and taxation was about to be rolled up to be borne by the people of the towns and counties upon whose credit it was incurred ; and this very extravagance of expenditure tended to defeat the object of offering bounties, and to impede the recruiting of the army, by appealing without stint to the cupidity of men and inducing them to delay volunteering, in the hope of getting a still larger bounty at a later day.   The act in question tended directly to repress these mischiefs.

The plaintiff's counsel argues in view of the peculiar language of the restriction that it was not intended to limit the *amount* to be paid for bounties.   The language is, " nor * * pay any money * * *otherwise* than is herein provided," and this, it is urged, does not restrict the amount.   The idea is naturally suggested by the form of expression used, which is not apt, but obviously, such is not the meaning.   If the restriction does not relate to the amount, it can only refer to the *mode* of raising money for bounties ; and it applies, in terms, to individuals, as well as to towns and counties.   But under section 22 of the act of 1864, individuals could not raise money in the mode prescribed by that section, and towns and counties could not raise it to pay bounties, in any other

mode. So that, upon the plaintiff's construction, the restriction would be inapplicable to individuals, and nugatory as to towns and counties. Besides, it would not meet any of the mischiefs already adverted to.

The construction contended for by the plaintiff's counsel is not aided by the circumstance that the last clause of section four expressly declares void all acts of county, town and city officers in contravention of the provisions of that section, and does not declare void the acts of individuals violating those provisions. That clause is declaratory merely. As the officers referred to had power under section 22 of the act of 1864, to raise money in the mode thereby provided to pay bounties, to an unlimited amount, and would continue to have the same power within the limits fixed by section four, it was expedient if not necessary to declare expressly that the exercise of such power in excess of the prescribed limits would be void; but such declaration was not needed in respect to the acts of individuals, as they derived no powers from the former statute, and their acts in violation of the later statute would be void without an enactment to that effect, by force of the common law. (1 *Kent,* 518.)

The plaintiff's counsel also claims that the agreement in suit is not within the prohibition of the act, as it does not provide for the payment of any sum whatever to a volunteer. But it requires the payment of a stipulated sum to the plaintiff in consideration of his procuring a certain number of volunteers to the credit of the plaintiff's town, and the sum stipulated by the two contracts exceeds the rate of 600 dollars for each man. By the contract, the plaintiff becomes a middleman, or recruit broker. It enables him to go into the market, and pay sums exceeding the amounts fixed by law as bounties for volunteers, and to retain a liberal profit to himself. That was the actual result in the present case. According to the testimony of the plaintiff himself, he paid $830 for the men, not to the men themselves, but to those who shipped them. If the transaction is valid, the statute is a dead letter.

The agreement is just as obnoxious to the policy of the act, as if it had stipulated that the sums expressed should be paid directly to the volunteers. It has the same tendency to create and foster the unhealthy competition which the statute was intended to suppress. It is an attempt to evade the statute, and consequently it is void, if the statute is valid.

This brings us to the consideration of the other positions taken by the plaintiff's counsel. First, that the restriction in section four is unconstitutional, and secondly, that it did not take effect till after the agreement sued on was made.

Respecting the constitutionality of the act, no question could have been entertained, but for the opinion delivered by the learned judge who decided this case at special term, on a demurrer to the complaint. (1 *Abb. N. S.* 129.) He held the act unconstitutional, and placed his decision upon the ground that the legislature have no power to prescribe to the citizen what price he shall pay for a substitute in the army. It will be observed, however, that the act expressly permits an individual to hire a substitute, in any way, to exempt himself from draft. It restricts individuals, only so far as is necessary to prevent the mischiefs at which the act was aimed. With all due respect, I conceive that the power of the legislature to adopt such restriction cannot be successfully questioned. The measure is clearly within the exercise of their undoubted power to provide for raising men to fill the quota of the state.

The remaining question is whether section four of the act took effect before the agreement was made. The agreement is dated the 9th of March, 1865. The act, (*ch.* 29,) was passed the 10th February, preceding, and it expressly provided that each of its sections should take effect immediately, except the eighth, ninth and tenth. Those sections authorized the creating of a state debt not exceeding $30,000,000, for the purpose of raising the means of paying the bounties provided for by the act, the bonds of the state to be issued to obtain the money, and the debt to be paid by tax,

the interest annually, and the principal in eighteen yearly installments. The eleventh, twelfth and thirteenth sections provided for submitting the question of the debt to the people at the next general election. On the 24th of February, 1865, the legislature passed another act, entitled "An act to provide for filling the quota of men required from this state for the army and navy of the United States, and to amend section twenty-two of chapter eight of the laws of 1864, and to regulate local bounties to volunteers, drafted men or substitutes." (*Ch.* 41.) The act consisted of eleven sections. The first seven were a transcript of the first seven sections of the act of February 10. The eighth appropriated not exceeding $30,000,000 for the purpose of paying the bounties provided for by said act ; the ninth provided that a state tax be levied not exceeding two *per cent per annum*, to be devoted to restoring to the treasury the money so appropriated ; and the tenth section authorized the comptroller to anticipate such tax by borrowing from any funds in the treasury, upon the credit of the general fund, the necessary sums to carry out the provisions of the act. The eleventh section furnishes the key to the construction of the first act, and is in these words : "This act is hereby declared to be a law from the time of its passage ; but it shall not take effect until after the canvass of the votes by the state canvassers next after the next general election, and if it should then appear at such canvass that a majority of the votes cast at such election upon the question of creating a state debt for the purpose of raising money to pay bounties for the purpose of filling the quota of men called for from this state under the said call of December 19, 1864, passed February 10, 1865, has been against creating such debt, then the said board of state canvassers shall at once, upon completing such canvass, certify that fact in writing to the governor ; and the governor shall at once, upon being so certified, issue his proclamation declaratory thereof, and from the day of issuing such proclamation this act shall take

effect. But if, in· making such canvass, it shall appear that a majority of the votes cast upon the said question have been for creating the said debt, then the said board of state canvassers shall at once, in writing, certify that fact to the governor, and the governor shall at once, by proclamation, make public such result ; and this act shall not then take effect until after the adjournment of the next legislature."

The first seven sections of the two acts being in precisely the same language, the plaintiff's counsel argues that the provision of the later act that those sections should not take effect till after the canvass, or till after the next session of the legislature, as the case might be, was an implied repeal of the provision of the first that they should take effect immediately. · The construction is ingenious, but I think it is not sound. The two acts had a common object, to wit, to raise moneys to pay bounties for the purpose of filling the quota of the state, but their modes of accomplishing the object were entirely different. The plan of the first was to provide for raising the money by creating a state debt under the twelfth section of the seventh article of the constitution which requires a submission to the people. The scheme of the second act was to provide for the contingency of a failure to obtain the requisite vote to ratify the plan of the first act, by appropriating from the state treasury the sum needed for bounties and levying a tax of two per cent to be applied to restoring in part the sum so appropriated. The latter act did not contemplate or require the repeal, suspension or abandonment of the former ; on the contrary, the former was to be tried, and if ratified by the people, it was to be carried out. Here, then, were two distinct plans, of each of which the first seven sections referred to were a part. As a part of the plan created by the first act, they were to take effect immediately after its passage, but as a part of the plan of the later act they were not to take effect till after the canvass. As a part of chapter 29, they had at once, and continued to have, the same effect, in all respects, as if chapter 41 had

not been enacted. This is made more apparent by chapter 56 of the laws of 1865, passed February 27, which provides, among other things, that a state tax of two per cent be levied for the next fiscal year, to raise means to pay the bounties directed to be paid by chapter 29, and authorizes the comptroller to issue bonds of the state in anticipation of the said tax, for the purpose of raising the money required for such bounties without delay, and also directs that if chapter 29 be approved by the people at the next election, said tax shall not be collected, and said bonds shall be paid from the proceeds of the stocks authorized by chapter 29.

The plaintiff's counsel claims further, that the effect of chapter 29 is postponed by the operation of its own section 11, which provides that "*this act* shall be submitted to the people at the next general election." The argument is, that the entire act is submitted, and, therefore, the effect of the whole is postponed till the result of the election is declared. The true construction of these words is, that only so much of the act is submitted as provides for the debt proposed to be created. That is all that it was necessary to submit, to accomplish the object of the act, and it is all that the legislature could properly submit to the people. (*Barto* v. *Himrod*, 8 *N. Y. Rep.* 483.) This construction makes sections 11 and 14, of chapter 29, consistent with each other, as to the time when the different provisions of the act shall take effect.

It may also be remarked, that the provisions of section 4, of chapter 29, may stand alone, even if all other parts of that act fail. The limitations which it imposes upon local bounties, have no necessary connection with the plan to create a fund for a state bounty.

For these reasons, I am of opinion the defendant is entitled to judgment on the verdict.

LEONARD, P. J. If it be held that section 11, chapter 41, of the laws of 1865, suspends the operation of chapter 29, of the same session, then the latter chapter will become nuga-

tory; as it will be seen that, in case the people voted against the loan, chapter 41 then came into operation; and should the vote be for the loan, the same chapter was also to take effect at a future period; the governor, in either case, having first issued his proclamation declaratory of the result. Which ever way the vote resulted, chapter 41 would eventually become operative; and if chapter 29 be suspended in the mean time, the seven sections which were identical in the two chapters, would never necessarily have any operation under the suspended act. This construction is equivalent to holding chapter 29 to have been repealed.

The existence of chapter 29 could not have been overlooked by the legislature, when the later act followed the former by the lapse of two weeks only. Nor is it probable that the repeal would have been left as the result of a legal implication, had such been the intention of the legislature.

It is agreed by my brother judges, in this case, and I concur, that the identity of the first seven sections of the two chapters does not effect a repeal of those sections in the first act. That the first act was not to become inoperative, according to legislative intention, is further confirmed by the enactment of chapter 56, by the same legislature, on the 27th February, a few days later only than the date of chapter 41, which was declared to be a law from the time of its passage, although the period when it was to go into effect was postponed.

Chapter 56 contemplates the payment of bounties directed by chapter 29, and provides for raising the money temporarily for that purpose by the comptroller, to be redeemed from the proceeds of a direct tax of two per cent, or from the proceeds of the loan, in case the people accepted that plan as proposed by chapter 29.

The construction that holds chapter 29 to be suspended, leaves no authority in force until several months have elapsed, (the election of the following November,) for the payment of bounties by the state; and thus the operation of a subsequent enactment (chapter 56) is also suspended, so far as it cop-

Powers *v.* Shepard.

templates an immediate expenditure of money from the treasury for that purpose.

These views make it entirely clear to my own mind, that it was the intention of the legislature that chapter 29 should be considered in full force, notwithstanding the enactment of chapter 41. The declaration, that chapter 41 is a law from the time of its enactment, also favors, in some degree, this construction, inasmuch as it would otherwise be inconsistent that similar provisions, contained in a former chapter, should be in operation as a law during the period when by chapter 41 they were not to take effect.

The conclusion is thence derived, that the contract sought to be enforced by this action, contravened the provisions of chapter 29, forbidding the payment of bounties above the prescribed amount, and is, therefore, void.

The point that the contract is not with a volunteer, nor for the payment of bounties, is not available. The policy of the law is destroyed by permitting contracts for procuring volunteers by the payment to any one of an amount beyond the sums prescribed by the act for bounty and hand money.

The defendant is, therefore, entitled to judgment upon the exceptions.

INGRAHAM, J. (dissenting.) There is nothing in the contract itself to impair its validity, and the only ground upon which it is claimed that the contract is void is, that it is in violation of the provisions of the law of 1865, (chapter 29.) The act of the legislature referred to, provided for a payment by the state of the sum necessary to procure volunteers, and authorized the issue of a stock for that purpose. It also provided, in the 3d section, for the payment to each volunteer of six hundred dollars if he enlisted for three years, and a less sum for a shorter term of service. In the 4th section, "any city, county or town, or any individual, was prohibited from paying any money for such purposes otherwise than as therein provided, and no city, county or town could borrow or raise,

by tax, any money for the purpose of paying bounties, &c. except as provided in section 7 of the act, and not to exceed one hundred dollars for hand money and incidental expenses for procuring each volunteer." The 7th section authorized the board of supervisors to raise money for this purpose of paying bounties and paying the incidental expenses, and limited the amount to be raised to six hundred dollars for three years men, and lesser sums for shorter terms. It was also provided for submitting to the people this act for their approval, and the last section directed that the 3d, 4th, 5th, 6th and 7th sections should take effect immediately, but the 8th, 9th and 10th sections (providing for a loan) should not become a law until ratified by the people.

On the 24th February of the same year, (chapter 41,) the legislature passed another act containing these sections, in the same words as in chapter 29, with other provisions, and providing for the submission to the people of the last act, and containing in the 11th section the following provisions, viz. that the act should be a law from the time of its passage, but should not take effect until after the canvass of the votes next after the next general election ; that if it should appear at such canvass that a majority of the votes cast were against creating the debt, the state canvassers should so certify to the governor, who was to issue his proclamation, and the act should take effect from the day of issuing the proclamation. If a majority of the votes were for creating the debt, the same was to be certified as before, but the act should not take effect until after the adjournment of the next legislature. Or, in other words, if the people did not approve of creating the debt, the act should take effect at once, and if they did approve of such debt, then the act should not take effect until after the session of the next legislature. Under either provision, however, this act was not in force at the time of the making of this contract, and its provisions have no effect thereon. There is nothing in the act directly repealing the former act, (chapter 29,) and the mere re-enactment of the

provisions of that act cannot be construed as a repeal thereof. We are, therefore, left to decide this case upon the provisions of chapter 29, so far as they were in force when the contract was made, unless the 11th section of the act, chapter 41, is to be construed as suspending the operation of the sections of chapter 29, incorporated therein. That section provided that none of the previous sections should in any event take effect until after the November election; that is, that the provision therein limiting the amount to be paid to a volunteer and for hand money, and which was in fact the same provision as was contained in section 4 of chapter 29, should not take effect until after the November election. I think the fair construction of this section is, that the legislature intended that these sections, and the enactments contemplated therein, should be suspended until after the people voted thereon. The object of submitting it to the people was to obtain their assent to a loan, and unless such loan was obtained, it was not deemed advisable in that act to restrain the payment of any sum to obtain volunteers, until after the vote of the people. If, notwithstanding, it should be held that the act (chapter 29) was in force, it would be in conflict with the provisions of the 11th section of the 41st chapter, and would render nugatory the provisions suspending the operations of the same sections as contained in the latter act. The two acts must be read together, and effect given to the provisions of both, as if they were incorporated in one act, and in such a manner as not to render either a nullity. Such a result can be attained by holding that those sections in the act chapter 29, which were incorporated into act chapter 41, and there re-enacted, are controlled in their operation by the provisions of the last act; and if so, then they were not in operation when this contract was made.

I do not concur in the opinion that the legislature could not limit the amount to be paid for volunteers. They had the power of prohibiting any but drafted men from being received in the army, and having that power, they might also

---

say that a limit should be placed on the sums to be paid for substitutes.

For the reasons, however, first stated, I think that at the time of making this contract there was no limitation in force, and that judgment should be rendered in favor of the plaintiff, upon the verdict.

Judgment for the defendant.

[NEW YORK GENERAL TERM, April 3, 1867. *Leonard, Ingraham* and *J. C. Smith,* Justices.]